*526 OPINION OF THE COURT
Lucy Billings, J.
I presided at the trial of this action before a jury August 10 through 15, 2005. On August 15, 2005, the jury rendered a verdict awarding plaintiff damages of $300,000 in past pain and suffering and $700,000 in future pain and suffering over 10 years. Defendants have moved to reduce the verdict on both past and future pain and suffering on the ground that the verdict is excessive. For the reasons explained below, the court denies defendants’ motion. (CPLR 5501 [c].)
As the predicate for awarding plaintiff damages, the jury found against defendants on each basis for their liability: (1) the pit bull dog in defendants’ possession and control that bit plaintiff on July 22, 2002 had vicious propensities, which defendants knew or should have known about; (2) on July 22, 2002, defendants negligently failed to maintain or control the dog or to take other measures to prevent harm to persons from the dog’s behavior, causing plaintiff injury. The jury also found that plaintiff was not negligent in entering the area where the dog that bit him was located. Defendants challenge none of these findings.
I. The Evidence of Damages
The testimony of plaintiff, his expert physician, and defendants’ expert physician establishes that plaintiff suffered and continued to suffer at the time of the trial a combination of injuries that diminished his enjoyment of life. One component of these injuries is his emotional distress from the dog’s violent attack, including intense fear immediately before and during the attack, flashbacks, and an ongoing, intense phobia of dogs that causes him to avoid all dogs. Another element is his nightmares, frequent at first, continuing less frequently, and causing fitful sleep, lost sleep, and consequent fatigue.
The further physical elements of plaintiffs pain and suffering derive from the bites themselves, to both his abdomen and his penis. The raised scar and nerve damage to his penis cause both pain and loss of sensation and consequent sexual dysfunction, which was total for several months following the attack and reduced his sexual functioning permanently. These physical consequences in turn exacerbate his emotional anxiety, feelings of inadequacy, and lost self-esteem in his line of work, intimate relations, and sexual performance.
*527 A. Fear and Emotional Distress Surrounding the Dog’s Attack
Plaintiff testified that defendants’ pit bull came at him at great speed, jumped on him, and attempted to bite his throat. When the dog started biting him, he “thought the worst. . . . Something that I’ll never forget . . . .” (Transcript of proceedings at 143, Aug. 11, 2005.) His clothes were torn apart and bloody. He observed an open, bleeding wound in his abdomen. When the dog bit his abdomen and then his penis, the dog’s teeth sank in and stayed embedded in his pants. Plaintiff was stunned by shock at the rapid sequence of events and anxious and in pain due to the bleeding.
Plaintiff was immediately admitted to St. Barnabas Hospital, where he was examined and treated by several physicians and remained overnight, his wounds were cleaned, and he was administered “[v]ery, very strong” antibiotics intravenously, rabies injections, and pain medication. (Id. at 171.) He was transported to his home the next day with instructions to continue oral antibiotics and pain medication, and returned for follow-up examination and treatment three days later.
The medical records detailing plaintiffs emergency condition and treatment were admitted without objection. (Exhibit 10.) Photographs of the wound to plaintiff’s abdomen during the first month after the dog’s attack (exhibits 6, 7), as well as photographs of the current scars to plaintiffs abdomen and penis from the dog’s attack (exhibit 8), also were admitted without objection.
B. Effect on Plaintiffs Livelihood
The puncture wounds to plaintiffs abdomen did not close for approximately three months. During that period he experienced a great deal of pain and pus oozing from the wounds to both his abdomen and his penis.
A taxi driver by trade, plaintiff attempted to drive, but was unable to endure the pinching pain and remained at home for five to six months. Plaintiffs work was important to him, part of his identity, self-esteem, and dignity, evidenced by the long hours he devoted to his work and satisfaction he derived from the services he rendered before the dog’s attack. Although he eventually returned to work, he lost his desire to work and gratification from that work, evidenced by his reduced hours. In addition to physical pain and limitations from the abdominal wounds, he suffered mental and emotional anguish and an enhanced loss of enjoyment in life from his lost desire to work and lost satisfaction in his work.
*528 C. Dr. Taranow’s Medical Findings
Douglas Taranow, M.D., specializes in plastic surgery, including rehabilitative and reconstructive surgery. He examines and treats patients in a clinic, performs plastic surgeries, and teaches plastic surgeons. He has treated hundreds of dog bites, continuing routinely in his current practice, so other physicians consult with him regarding his opinions in such cases.
Dr. Taranow testified that dog bites are the worst and dirtiest bites except human bites. A dog bite is “a contaminating wound, . . . there’s a lot of bacteria in a dog’s mouth.” (Transcript at 172, Aug. 11, 2005.) The “bacteria get[ ] under the skin .... It’s a perfect breeding ground for them. . . . [Tjhat’s why we get infected.” (Id. at 173.)
For these reasons plaintiffs dog bites were not stitched and closed, but were left open to “drain out.” (Id.) Because the dog does not just bite, but bites and then tears, the lacerations are jagged holes and do not heal as well as straight lacerations from a knife or piece of glass. Unlike straight lacerations, multiple puncture wounds from dog bites cause crushing injuries that damage structures below the skin and leave dents or divots under the skin.
The photographs of the wound to plaintiffs abdomen during the first month after the dog’s attack (exhibits 6, 7), show the pattern of the dog’s teeth. The dog’s upper jaw alone was approximately 4.5 inches wide. The dog “got a good grip” (transcript at 181, Aug. 11, 2005), and “a good piece of him,” as shown by the puncture wounds from each tooth that cut through all the layers of skin and broke the blood vessels underneath. (Id. at 182.) The vertical lines extending from the teeth marks show that the dog grabbed plaintiff, then “let go a little,” and went “for a better bite” in another area. (Id. at 183.) The dog’s teeth slid down plaintiffs skin to the second area “leaving ... a track mark.” (Id. at 184.) The bites caused damage far beyond where they penetrated, as shown by the large surrounding black and blue area.
When plaintiff returned to St. Barnabas Hospital on July 26, 2002, he exhibited a pool of blood from internal bleeding collected under his skin in his lower right abdomen. He was in pain and suffered from nausea and diarrhea. When the dog bites penetrated into plaintiffs blood vessels, the bacterial infection from the bites spread from the wound sites to his blood stream, which increased the wounds’ size and the loss of tissue and inhibited healing.
*529 The penis has very little fat and consequently very little cushioning against a puncture wound from an external force. The skin on the penis is extremely thin, with the nerves directly underneath, so a puncture easily penetrates to damage them. The photograph of the current scars to plaintiffs penis from the dog’s attack (exhibit 8) shows not just a crush injury to his skin, but damage underneath and thus to his nerves there.
Upon Dr. Taranow’s examination two months before the trial, Dr. Taranow found plaintiff, at age 39 years, still suffering from pain in his abdomen, numbness along his penis, erectile dysfunction, fear of dogs, and associated depression. The scar on his lower right abdomen was hyperpigmented, with thickness under the skin extending wider than the scar itself. Both the scar and the wider area were painful upon palpation. Dr. Taranow’s findings regarding the scar and pigmentation on plaintiffs penis were consistent with the photograph (id.), showing decreased pigmentation and a raised, thick scar along the shaft.
Dr. Taranow attributed plaintiffs loss of ability to maintain an erection during sexual intercourse to both physiological and psychological causes. His nerve damage causes his numbness and loss of sensation. His scar tissue directly below the skin, whether in the nerves or not, causes his pain, as do neuromas, small knots in the middle of the nerves formed when damaged nerves grow back. The neuromas are treatable only by excising them, which entails cutting the nerves, causing further numbness, and hence is contraindicated in this area of the body.
Plaintiffs loss of sensation and pain during sexual intercourse are enough to cause him to lose his erection. The physiological causes, however, in turn trigger memories of the dog’s attack and plaintiffs fear of dogs. These mental and emotional distractions compound plaintiffs inability to maintain an erection.
The numbness and pain and consequent difficulties in functioning in both plaintiffs abdomen and his penis are permanent conditions. Plaintiff’s phobia of dogs and depression due to the physical consequences and memories of the dog’s attack were a product of that attack and are also permanent. In the hundreds of dog bites Dr. Taranow had treated, a permanent, intense fear of dogs is a common effect.
Defendants’ cross-examination of Dr. Taranow lasted but a few minutes and challenged none of his testimony’s substance or his credentials. All his testimony remained uncontradicted.
*530 D. Dr. Levandusky’s Medical Findings
In fact, defendants’ expert, Ronald Levandusky, M.D., also a plastic and reconstructive surgeon, albeit less experienced with dog bites, supplemented Dr. Taranow’s testimony. In May 2003 when Dr. Levandusky examined plaintiff, Dr. Levandusky found eight vertical parallel scars on plaintiffs abdomen, at least one of which was hard. Plaintiffs abdominal scars caused plaintiff deep pain and discomfort, particularly when touched or when he moved that part of his body. He was self-conscious and became upset about the scars on both his abdomen and his penis in intimate situations and when exposing those parts of his body.
Dr. Levandusky also described how the tubes in the penis that permit it to become erect are very close to the surface where they are susceptible to damage, and if nerve damage does not heal within a year, the injury is permanent. He corroborated that plaintiffs pain and loss of sensation in his penis disrupted sexual functioning. Plaintiff experienced difficulty achieving an erection because his penis would start hurting.
Dr. Levandusky pointed out that a plastic surgeon encounters the psychological aspects of injuries that alter patients’ appearance or functioning “as part of the whole picture.” (Transcript at 261, Aug. 12, 2005.) A patient with such injuries requires attention to the connected effects on self-esteem or self-worth. Erectile dysfunction very frequently is accompanied by anxiety. Dr. Levandusky found that plaintiff experienced flashbacks and nightmares of the pit bull attacking him and suffered emotional distress from the dog’s attack as well as from his scars’ effects on his appearance and functioning.
II. Material Deviation from Reasonable Compensation
To set aside the jury’s verdict as excessive, the court must conclude that the jury’s award materially deviates from reasonable compensation (CPLR 5501 [c]), by looking to awards in analogous actions that have been approved on appellate review and determining that the current award departs substantially from those benchmarks. (Donlon v City of New York, 284 AD2d 13, 14-15, 18 [1st Dept 2001].) Nonetheless, in no two actions are “the quality and quantity” of damages, particularly for pain and suffering, identical. (Reed v City of New York, 304 AD2d 1, 7 [1st Dept 2003].) Their “evaluation does not lend itself to neat mathematical calculation.” (Id.; see Donlon v City of New York, 284 AD2d at 15.) The court must exercise caution and not simply substitute the court’s view of the evidence for the six *531 factfinders’ judgment or modify the harshness of a verdict the court disagrees with, particularly on damages, when the jury’s peculiar function is to evaluate damages. (Po Yee So v Wing Tat Realty, 259 AD2d 373, 374 [1st Dept 1999]; see Mazariegos v New York City Tr. Auth., 230 AD2d 608, 609 [1st Dept 1996]; Brown v Taylor, 221 AD2d 208, 209 [1st Dept 1995]; Evans v St. Mary's Hosp. of Brooklyn, 1 AD3d 314, 315 [2d Dept 2003].)
The jury’s verdict in this action is particularly unsusceptible to evaluation by precise standards not only because it involved a unique combination of injuries with reciprocal exacerbating effects, as recited above, but also because of their uniquely subjective impact on this particular plaintiff. (Donlon v City of New York, 284 AD2d at 15; Weigl v Quincy Specialties Co., 190 Misc 2d 1, 7-8 [Sup Ct, NY County 2001]; see also 1 AD3d 132, 134 [1st Dept 2003].) Therefore it “is virtually impossible” to impose the standards of other verdicts on the verdict here or to substitute the court’s judgment based on such standards. (Po Yee So v Wing Tat Realty, 259 AD2d at 374; Weigl v Quincy Specialties Co., 190 Misc 2d at 5; see also 1 AD3d at 134.) Evaluation of prior awards in similar personal injury actions is to ascertain a consensus of opinion among juries and courts regarding the relation between the particular injuries and the compensation awarded, to guide the court in resolving an award’s disputed adequacy, and to achieve fairness and even-handedness. (Donlon v City of New York, 284 AD2d at 15-16; Weigl v Quincy Specialties Co., 190 Misc 2d at 4, 8-9.) Here, prior awards, even when closely analyzed, provide little guidance, because none is based on comparable, compounding injuries that comparably impacted the plaintiff. (Po Yee So v Wing Tat Realty, 259 AD2d at 374; Weigl v Quincy Specialties Co., 190 Misc 2d at 7-8.)
Absent a benchmark or comparability, reduction of damages does not serve the ends of fairness and evenhandedness. In such circumstances, tinkering with the award only flaunts the deference due the jury’s assessment of damages and eliminates the factfinders’ “peculiar function.” (Po Yee So v Wing Tat Realty, 259 AD2d at 374; Weigl v Quincy Specialties Co., 190 Misc 2d at 5; see id. at 8-9.)
The evidence of plaintiffs past and future pain and suffering not only concerned a unique combination of injuries with unique effects; this evidence also uniformly weighed in his favor; defendants presented no evidence controverting plaintiffs evidence of his pain and suffering. (Kane v Coundorous, 11 AD3d *532 304, 305 [1st Dept 2004]; Reed v City of New York, 304 AD2d at 9-10; Martelly v New York City Health & Hosps. Corp., 276 AD2d 373, 374 [1st Dept 2000]; see Mazariegos v New York City Tr. Auth., 230 AD2d at 609; Wiseberg v Douglas Elliman-Gibbons & Ives, 224 AD2d 361, 362 [1st Dept 1996].) While the jury was well within its function to assess each expert’s credentials, reject all or part of the expert’s opinions, and discredit the testimony regarding the scope and intensity of plaintiffs injuries (People v Miller, 91 NY2d 372, 380 [1998]; Wiseberg v Douglas EllimanGibbons & Ives, 224 AD2d at 362; Cavlin v New York Med. Group, 286 AD2d 469, 471 [2d Dept 2001]), the jury was free instead to credit that testimony and draw every reasonable inference in plaintiffs favor from the evidence. (Alexander v Eldred, 63 NY2d 460, 468 [1984]; Kane v Coundorous, 11 AD3d at 304; Mazariegos v New York City Tr. Auth., 230 AD2d at 609-610.) Viewing the evidence in this light, few, if any, decisions are useful as benchmarks.
III. Maximum Reasonable Compensation for Plaintiff’s Pain and Suffering
It is incumbent on defendants, in seeking to reduce the jury’s award, to cite verdicts, including their fate on appeal, that assess injuries, similar to plaintiffs, experienced for comparable periods. (See Donlon v City of New York, 284 AD2d at 14, 18.) While the awards defendants cite may shed further light on the factors to be considered in assessing reasonable compensation, the circumstances producing these awards do not delineate the limits of compensation for injuries that parallel plaintiffs suffering. None of these awards, nor any other reported awards, although they involved superficially factual similarities to plaintiffs injuries, include all or even most of plaintiffs various combined injuries, with such extensive effects on the particular individual.
A. Awards for Genital Injuries and Sexual Dysfunction Cited by Defendants
First, when an appellate decision simply affirms an award and does not specifically determine whether it is excessive, it is not a useful benchmark. (See Fiutko v Komin, 198 AD2d 924 [4th Dept 1993].) Moreover, when the decision does not reveal the pertinent evidence, the court may not simply accept defendants’ rendition, without any citation. (See Aponte v New York City Health & Hosps. Corp., 86 AD2d 788, 789 [1st Dept 1982]; Fiutko v Komin, 198 AD2d 924 [1993].)
Even based on defendants’ own description, however, the summary affirmance in Fiutko v Komin (198 AD2d 924 [1993]) *533 provides nothing more than a verdict in Niagara Falls, more than 12 years before plaintiff Medina’s verdict, for temporary swelling and bleeding from circumcision of a three-day-old infant, without mention of any consciously experienced adverse effects. The procedure left permanent scarring and a redundant foreskin, but again without mention of any adverse effects whatsoever.
Gunder v Murthy (185 AD2d 915 [2d Dept 1992]) did reduce a verdict for complications from a vasectomy to $180,000. This verdict, in Suffolk county, was even older, more than 15 years before Medina’s verdict. Tenderness from the surgery prevented the plaintiffs sexual relations for two months. {Id. at 915-916.) The only injury other than pain upon an erection was anxiety concerning intercourse. The evidence reviewed reveals no actual difficulty with intercourse or intimacy after the initial two months. {Id. at 916.) The decision emphasizes the lack of residual injuries; instead, a corrective procedure immediately following the vasectomy achieved its intended result: normal genitalia and the absence of any complaints by the plaintiff regarding pain or other problems upon subsequent physical examinations. (Id. at 916-917; see Sutch v Yarinsky, 292 AD2d 715, 716 [3d Dept 2002].)
That award, then, was principally for two months of pain and suffering, limited to the genital area and interrupted sexual activity. The reduced award of $180,000 fails to account not only for the different venue and 15 years of inflation, but also for the 13 years of Medina’s vastly broader and deeper pain and suffering. Even based on defendants’ description of the evidence in Aponte v New York City Health & Hosps. Corp. (86 AD2d at 789), the reduced award of $125,000 for a negligent circumcision causing scarring and sexual dysfunction, of undisclosed duration, from 1980, 10 years earlier, albeit in this venue, is of similarly limited comparability.
In contrast, the events surrounding Medina’s initial injuries caused intense emotional distress and continuing fear of all dogs, flashbacks, nightmares, loss of sleep, and pain and scarring in two areas. These effects in turn impaired his ability to engage in and enjoy his livelihood, any activities involving exposure of his abdomen, and intimacy, as well as his sexual functioning. Viewed in this light, $160,000 for the first year following Medina’s injuries and $70,000 for each of 12 years afterward, the equivalent of his award, is not excessive compared with the reduced awards in Gunder v Murthy (185 *534 AD2d 915 [1992]) or Aponte v New York City Health & Hosps. Corp. (86 AD2d 788 [1982]).
Wagner v Kenific (161 AD2d 1092, 1094 [3d Dept 1990]), not cited by defendants, provides a better, but still limited benchmark. Upon an appeal for excessiveness, the court affirmed $375,000 for past pain and suffering in Albany county, covering approximately six years from the 1982 injury to the verdict, but primarily involving a temporary period when the burns to the plaintiff’s arm, abdomen, and right groin and genital area caused him pain in his arm and prevented intimate or sexual relations. Although the plaintiff also suffered burns to his face, neck, chest, and hand, the burns resulted only in depigmentation of his arm and abdomen.
Medina’s injuries were to just two areas of his body, but accounting for over 16 years of inflation, and the continuing effects on his mental condition, functioning, and appearance, his $300,000 award is not excessive in comparison. By the same benchmark, $700,000 for another 10 years of these continuing effects is reasonable.
Although Dominguez v Fixrammer Corp. (172 Misc 2d 868, 875-876 [Sup Ct, Bronx County 1997]) was in this venue and the verdict was only nine years before Medina’s verdict, there the plaintiff sought to increase the verdict. In such instances the court’s determination is even less instructive than a simple affirmance that does not address adequacy, because in those instances, the determination is whether the verdict is minimally adequate, within the lower limit of the range of awards justified by the evidence. Here, of course, the determination is precisely the opposite: whether the verdict is within the upper limit of the range of justifiable awards. Therefore the refusal to increase the plaintiffs $4,000 award for future pain and suffering and $485,660 award for past pain and suffering is of limited value. (Id. at 871, 875-876.) Furthermore, like the above cases, the plaintiffs injuries had little lasting effect. (Id. at 876.) His physical injuries were limited to his testicle, where removal of the damaged testicle eliminated his pain and any potential cause of sexual dysfunction, and did not affect his penis or sexual performance. Nor did his episodes of depression cause any sexual dysfunction or last beyond two years. Nonetheless, despite the limited scope of injuries, the jury awarded $485,660 for past pain and suffering. (Id. at 871.)
B. Awards for Dog Bites
Absent from all the above cases is the type of trauma occasioned by the pit bull’s violent, vicious attack in this case, *535 causing intense fear and emotional distress, including continuing phobia of dogs, flashbacks, nightmares, and loss of sleep. Even disregarding plaintiff’s bodily pain and scarring, these other effects caused fatigue and preoccupation, curtailed his work, diminished his self-image and self-esteem, hindered intimate relationships, and impaired his sexual functioning.
The evidence here established that plaintiffs conditions are common effects from dog attacks and bites. Aversa v Bartlett (11 AD3d 941 [4th Dept 2004]), however, concerned only physical effects: lacerations, bruising, swelling, and a nasal fracture. Although they were to facial areas and temporarily caused difficulties in breathing and vision, again the effects were almost entirely temporary, without scarring. Because of the limited injuries, for which the jury awarded $100,000 in past pain and suffering, that verdict would, at best, serve as a benchmark for a limited component of Medina’s injuries.
Moreover, when the Court there refused to reduce and affirmed the award, as the Court did in Wagner v Kenific (161 AD2d 1092 [1990]), even though the defendant challenged it as excessive, the affirmance still stands only as a determination that the award fell somewhere within the range of awards justified by the evidence. It does not indicate that a considerably higher verdict is not within the upper limit of that range.
By the same measure, when the Court in Shurgan v Tedesco (179 AD2d 805, 806 [2d Dept 1992]) increased the verdict to $150,000 due to inadequacy, the Court merely was raising the verdict into the minimally reasonable range. That verdict, from Nassau county more than 15 years before plaintiffs verdict, was for facial lacerations from a dog bite that did cause scarring, but reparable through surgery, without any demonstrated mental, emotional, or functional effects. If that verdict is any benchmark for a minimally adequate award for a component of Medina’s injuries, the benchmark indicates that his verdict, in this county more than 15 years later, for mental, emotional, and functional injuries, as well as permanent scars, is within the maximum limit for an award covering 13 years.
C. The Upper Limits
Verdicts for sexual dysfunction accompanied by other trauma are other potential benchmarks. Most recently, the Court in Allison v Erie County Indus. Dev. Agency (35 AD3d 1159, 1160 [4th Dept 2006]) reduced an award for injuries from plaintiff Allison’s 15-to-20-foot fall to the ground, which caused spinal fractures, required surgery, and left Allison with continued back *536 pain, abnormal defecation, and the use of a catheter for urination, as well as sexual dysfunction. There, the Court found Allison’s injuries warranted awards of $1,000,000 for past pain and suffering, for an undisclosed period, and $4,000,000 for future pain and suffering, to a plaintiff of undisclosed life expectancy. (Id.) The impairments accompanying his sexual dysfunction were greater than Medina’s mental and emotional trauma, scarring, and abdominal injuries. The jury’s valuation of Medina’s combined injuries at a mere 20% of that award, however, is justifiable.
Although Sutch v Yarinsky (292 AD2d 715 [2002]), affirming awards of $300,000 for past pain and suffering and $500,000 for future pain and suffering, involved complications from left breast reduction surgery, the associated consequences are analogous to Medina’s suffering. The plaintiff in that case was left with a large scar in her nipple area, the appearance of which was remediable by reconstruction surgery. While she suffered shock and acute anxiety when she first looked at her breast after the reduction, nothing comparable to Medina’s continuing phobia, flashbacks, nightmares, and loss of sleep was mentioned. Yet she did suffer long-term anxiety, depression, and loss of identity similar to Medina’s suffering. (Id. at 716-717.)
Like Medina, the plaintiff in Sutch v Yarinsky was “no longer the happy and confident person she was,” “lost her once ‘wonderful’ and ‘loving’ sexual relationship” with her spouse, refused to disrobe fully during sexual relations or otherwise in her spouse’s presence, and felt “horrible” when she looked at herself in the mirror. (Id. at 716.) Although her spouse died, she feared rejection and the inability to engage in relationships with other men. She experienced no functional impairment, however, to her ability to engage in sexual activity.
Sutch v Yarinsky (292 AD2d 715 [2002]) does not disclose the period covered by the plaintiff’s future award. Nevertheless, with her spouse’s death, she lost her intimate and sexual partner and likely suffered severe emotional consequences from that event independent of the defendant’s actions. Medina, on the other hand, remained with his intimate and sexual partner, yet feared her rejection and lacked the ability to engage in the same relationship with her as previously, and should they separate, was likely to suffer at least as much difficulty with other women.
Drawing this comparison, and considering as well Medina’s intense fear of dogs, flashbacks, nightmares, abdominal injuries, *537 and functional impairment to sexual activity, his identical $300,000 award for past damages is justifiable. Considering these additional components of Medina’s injuries, and in comparison to his award for the past damages, using, for example, the equivalency standard suggested above ($160,000 for the first year and $70,000 for each of 12 years afterward), the additional $200,000 awarded to Medina for future damages is also justifiable.
IV Conclusion
In sum, plaintiff presented evidence of his injuries and resulting pain and suffering, uncontroverted by defendants. The jury credited his testimony, Dr. Taranow’s testimony, and Dr. Levandusky’s testimony insofar as it corroborated and supplemented the other testimony in plaintiffs favor and awarded past and future damages that do not so exceed amounts supported by a fair interpretation of the evidence as to require disturbing the jury’s determination. Although defendants now characterize plaintiffs injuries as minimal, no medical testimony, even presented by defendants, supports that assessment.
The jury’s $300,000 award for past pain and suffering and $700,000 award for future pain and suffering were not so excessive as to materially deviate from reasonable compensation. Given this plaintiffs unique combination of injuries, this jury was uniquely qualified to assess his damages and set its own benchmark. Therefore the court denies defendants’ motion to reduce the verdict. (CPLR 5501 [c].)